**DRAFT AS OF JUNE 1, 2009**
**RETURN TO KEVIN**

**HEARING DATE: 6/15/09**

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **THOMAS N. SMITH,** | 1:05-CV-01187-OWW |
| **Plaintiff,** | **MEMORANDUM DECISION RE DEFENDANTS DARRIN SIMMONS AND CLEAN AIR PRODUCTS, INC.'S MOTION FOR SUMMARY JUDGMENT OR PARTIAL ADJUDICATION (DOC. 114.) AND MOTION FOR SANCTIONS (DOC. 112.)** |
| **v.** | |
| **DARRIN SIMMONS, *et al.,*** | |
| **Defendants.** | |

### I. INTRODUCTION.

Plaintiff Thomas N. Smith initiated this action on September 19, 2005, and, on April 3, 2008, filed the operative fourth amended complaint ("4thAC") alleging breach of contract. Plaintiff alleges that Defendants Darrin Simmons ("Simmons") and Clean Air Products, Inc. ("Clean Air") breached a 1998 asset purchase agreement and a 2001 referral agreement. Plaintiff claims that Clean Air and Simmons are liable under the agreements either because the corporation and Simmons are alter egos of one another or because Simmons is directly liable as a party.

This matter is before the court on a motion for summary judgment, or in the alternative, summary adjudication pursuant to

1

Rule 56 of the Federal Rules of Civil Procedure.  Defendants have also filed a motion for Rule 11 sanctions against Plaintiff and his attorney.

Defendants argue they are entitled to summary judgment or adjudication because: 1) the 1998 contract is void for illegality and lack of mutuality; and 2) the 2001 contract was subject to a condition precedent that was never satisfied.  Defendants also contend that there is no genuine issue of material fact regarding Clean Air's corporate form or that Simmons personally assumed liability under the 1998 or 2001 contracts.

Plaintiff opposes the motion, arguing that the November 1998 contract was not made for an improper or illegal purpose.  Rather, Plaintiff asserts that the document accurately sets forth the sale of Help Smog Parts' assets.  Plaintiff also contends that a triable issue of fact exists as to whether the 2001 Agreement relates only to the sale of the entire business,  whether Simmons is liable pursuant to an alter ego theory whether, and Simmons personally assumed liability under the 1998 and 2001 Agreements.

## II.  **FACTUAL BACKGROUND.**[1]

The following background facts are taken from the parties' submissions in connection with the motions and other documents on

---

[1] Unless otherwise noted, the facts herein are undisputed. (See Stmt. of Undisp. Facts in Support of Def.'s Mot. for Summ. J. ("DSUF"), filed by Defendants on Apr. 1, 2009).

file in this case.[2]

**A.    The Parties**

Plaintiff is an individual maintaining residences in New Zealand and the United States.[3] (4thAC ¶ 1.) At all relevant times herein, Plaintiff was the sole owner of all the issued stock in Land O'Goshen, Inc., ("Land O'Goshen") which entered into a 1998 written agreement with Defendants to sell the assets of "Help Smog Parts, Inc." (*Id.* ¶ 9.)

Defendant Simmons, sole owner of Clean Air Products, Inc., is an individual residing in Tulare County. (*Id.* ¶ 2.) Defendant Clean Air is a California corporation with its principal place of business in Tulare County. (*Id.* ¶ 3.) Clean Air currently operates Help Smog Parts, Inc., with its principal place of business in Visalia, California. (DSUF 22.)

**B.    The 1998 Written Agreement**

A written agreement was entered into on November 23, 1998 between Land O'Goshen, Inc. and Clean Air ("1998 Agreement"). (Doc. 98, 4thAC, Exhibit 1, p. 1) Under the terms of the 1998 Agreement, Land O'Goshen sold inventory from an auction held by Help Smog

---

[2] "A district court does not, of course, make 'findings of fact' in ruling on a summary judgment motion. Findings of fact are made on the basis of evidentiary hearings and usually involve credibility determinations." *See Rand v. Rowland*, 154 F.3d 952, 957 n.4 (9th Cir. 1998).

[3] At the commencement of this action, Plaintiff maintained a residence in Portland, Oregon. He now maintains a residence in the State of Washington. (4thAC ¶ 1.)

Parts, including the 800 telephone number, the customer database, the operating systems and various other business property and services. (*Id.* ¶ 9)  Plaintiff was the sole owner of stock in Land O'Goshen and all rights in the "agreement" were assigned to Plaintiff once the assets were sold to Clean Air. (*Id.* at ¶ 11.)

The 1998 Agreement's introductory paragraph states "[t]his Agreement is between Land O'Goshen, Inc., Seller and Clean Air Products, Inc., buyer, dated November 23, 1998." (DSUF 25.)  The 1998 Agreement was signed by Plaintiff on the line designated "Thomas N. Smith" and Defendant Simmons signed on the line designated as "Darrin Simmons."  (DSUF 28.)  Defendant Simmons signed his name and added his title "V.P." next to his signature. (*Id.*)

The 1998 Agreement specifies four conditions relevant to the asset sale:[4]  1) that the contract signed July 1, 1998 between Land O'Goshen, Inc. and Clean Air Products, Inc. becomes null and void and is superceded by the 1998 Agreement;  2) that the contract signed July 1, 1998 between Thomas N. Smith and Clean Air Products, Inc. becomes null and void and is superceded by the 1998 Agreement; 3) and 4) outline the payment terms, detailing a purchase price of $430,000 and a down payment of $70,000.

The record indicates that Defendants performed under the 1998 Agreement for five years.  They ceased making payments in 2003. Plaintiff claims that Defendants' breach resulted in damages of $278,929, plus interest.  He seeks recovery from Clean Air and Simmons.

---

[4] Doc. 98, 4thAC, Exh. 1, p. 1.

**4**

While Defendants do not contest they discontinued payments under the 1998 Agreement, they argue that Plaintiff cannot reach Simmons, individually, for recovery.[5]  According to Defendants, the distinction between Clean Air and Simmons is clear and any money owed on the 1998 Agreement is owed by Clean Air.

## C.   **2001 Written Agreement**

An Agreement and Contract of Sale, dated October, 2001, was entered between Defendant Simmons, as "President of Clean Air Products, Inc." and Plaintiff. ("2001 Agreement"). (Doc. 98, 4thAC, Exh.2, pg.1.)  Under the terms of 2001 Agreement, Plaintiff was to prepare a business plan and solicit prospective buyers to be referred to Defendant Simmons to close the deals. (SUF 12.)  If such a buyer was secured, the sales and proceeds would be divided among "Plaintiff and Clean Air Products, Inc." based upon the terms set forth in the 2001 Agreement. (DSUF 12.)  The 2001 Agreement is signed by Thomas N. Smith on a line designated "Thomas N. Smith" and Defendant Simmons, on a line designated "Darrin K. Simmons, President, Clean Air Products, Inc. dba Help Smog Parts." (Doc. 98, 4thAC, Exh.2, pg.1.)

The 2001 Agreement prescribes four conditions relevant to the referral agreement.  (DSUF 32.)  The first item states that "[a]fter the figure of 500,000.00 is exceeded, any overage will be split 50/50 between Smith and Clean Air Products, Inc." (Doc. 98, 4thAC, Exh.2, pg.1.)  The second item provides an example of the

---

[5] Simmons admits in his declaration that, prior to the October 2001 Agreement, he "still owed Thomas N. Smith money on the November 1998 Contract."  (Simmons Decl. at 2:9-2:11.)

revenue split.   (Id.)   The third item states that the 2001 Agreement does not affect any previous "Sales Agreement or Contracts between Smith, Simmons, Land O'Goshen, Inc., or Clean Air Products, Inc."  (Id.)  The final item provides that any closing costs related to the sale will be split evenly between Smith and Clean Air, Products, Inc.  (DSUF 33.)

According to Plaintiff, the purpose of the 2001 Agreement was to steer prospective buyers to Simmons and increase revenue at Help Smog Parts.  (Decl. Smith ¶ 5.)   The prospective buyers could purchase existing inventory or, potentially, the entire business. (*Id.*)  Plaintiff claims that he referred customers pursuant to the 2001 Agreement, but does not know whether any of the referrals resulted in sales.  (*Id.* ¶ 7.)

According to Defendants, Clean Air agreed to pay a commission to Plaintiff if he referred "buyers," one of which bought Help Smog Parts from Defendants for a purchase price of at least $500,000. (DSUF 12.)  Defendants argue that Plaintiff cannot recover under the 2001 Agreement because Defendants never sold Help Smog Parts, a condition precedent to Plaintiff's commission.  (DSUF 12.)

### III. **PROCEDURAL BACKGROUND**.

In the original complaint, Plaintiff, appearing pro per, brought several causes of action related to Land O'Goshen's sale of certain assets to Defendants pursuant to several written contracts.[6]  (Doc. 1.)   Defendant Simmons filed a motion to

---

[6] Clean Air Products, Inc. was not named as a party in the original complaint.

**6**

dismiss for lack of subject matter jurisdiction and failure to state a claim.  (Doc. 8, Motion to Dismiss I.)

On February 9, 2006, Plaintiff filed his first amended complaint, again seeking damages for breach of the 1998 and 2001 written contracts.  (Doc. 11, First Amended Complaint ("FAC").) On April 3, 2006, Defendant Simmons again filed a motion to dismiss for lack of subject matter jurisdiction and failure to state a claim.  (Doc. 15, Motion to Dismiss II.)  On June 19, 2006, Plaintiff was granted leave to file an amended complaint.  (Doc. 18.)

On July 5, 2006, Plaintiff, now represented by counsel, filed a second amended complaint alleging breach of contract and fraud.[7] (Doc. 19, Second Amended Complaint ("SAC").)  Plaintiff's claims were based on the 1998 and 2001 written contracts.  (Id.)  On July 25, 2006, Defendants moved to dismiss Plaintiff's third cause of action for fraud.  (Doc. 20.)  On September 15, 2006, Defendants' motion was granted with prejudice.  (Doc. 24.)  On October 4, 2006, Defendants filed an answer to Plaintiff's second amended complaint. (Doc. 26.)

On July 6, 2007, Defendant Darrin Simmons filed a motion for judgment on the pleadings.  (Doc. 42.)  Defendant's motion was granted on September 25, 2007, although Plaintiff was permitted leave to amend.  (Doc. 73.)

On October 10, 2007, Plaintiff filed a third amended complaint against Defendant Simmons and Defendant Clean Air for breach of the

---

[7] Plaintiff retained his current counsel in March 2006. (D. Gilmore Decl. ¶ 2.)

1998 and 2001 written contracts.[8]  (Doc. 77, Third Amended Complaint ("TAC").)  On October 23, 2007, Defendant Darrin Simmons filed a motion to dismiss pursuant to Rules 12(b)(1) and (12(b)(6). (Doc. 85, Motion to Dismiss III.)  Defendant's motion was granted, in part, on March 18, 2007, although Plaintiff was again permitted leave to amend.  (Doc. 97.)

On April 3, 2008, Plaintiff filed a fourth amended complaint, bringing his claims pursuant to the 1998 and 2001 written contracts.  (Doc. 98, Fourth Amended Complaint ("FAC").)  On April 23, 2008, Defendants filed an answer to Plaintiff's fourth amended complaint.  (Doc. 101.)

On March 31, 2009, Plaintiff filed a motion for leave to file a fifth amended complaint.[9]  (Doc. 108.)

On April 1, 2009, Defendants filed this motion for summary judgment or, in the alternative, summary adjudication. (Doc. 114.)

On April 1, 2009, Defendants filed a motion for sanctions pursuant to Rule 11.  (Doc. 112.)  Defendants' motion for sanctions challenges Plaintiff's February 9, 2009 deposition testimony where he admitted that the purpose of the November 1998 contract was to defraud creditors.  Defendants argue that Plaintiff is subject to Rule 11 sanctions because he initiated and maintained the present lawsuit with full knowledge of the 1998 contract's illegality.

On June 1, 2009, Defendants filed an opposition to Defendants'

_____

[8] Defendant Clean Air Products, Inc. was not a named Defendant prior to Plaintiff's TAC.  Plaintiff's previous iterations listed "Darrin Simmons, dba Clean Air Products, Inc." as the sole Defendant.

[9]  The motion for leave to amend filed by Plaintiff Thomas N. Smith is resolved by separate Memorandum Decision.

motion for summary judgment or, in the alternative, summary adjudication.[10]  (Doc. 130.)

## IV.  **LEGAL STANDARDS**

"The standards and procedures for granting partial summary judgment, also known as summary adjudication, are the same as those for summary judgment." *Mora v. Chem-Tronics, Inc.*, 16 F. Supp. 2d 1192, 1200 (S.D. Cal. 1998). Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).

With respect to an issue as to which the non-moving party will have the burden of proof, the movant "can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case." *Soremekun*, 509 F.3d at 984. When a motion for summary judgment is properly made and supported, the non-movant cannot defeat the motion by resting upon the allegations or denials

---

[10] Defendants' opposition was untimely under Local Rule 78-230(c).  An Order to Show Cause was issued on June 2, 2009. (Doc. 137.)

of its own pleading, rather the "non-moving party must set forth, by affidavit or as otherwise provided in Rule 56, 'specific facts showing that there is a genuine issue for trial.'" *Soremekun*, 509 F.3d at 984. (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). "Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment." *Id*.

"[S]ummary judgment will not lie if [a] dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In ruling on a motion for summary judgment, the district court does not make credibility determinations; rather, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

### V.   DISCUSSION

### 1.   Motion For Summary Judgment/Summary Adjudication

Defendants argue Plaintiff's claims fail as a matter of law because: 1) the 1998 contract is void for illegality and lack of mutuality; 2) the 2001 contract was subject to a condition precedent that was never satisfied; 3) Simmons never personally assumed liability under the 1998 or 2001 contracts; and 4) Simmons is not liable under an alter ego theory.

### A.   The 1998 Contract

Defendants move for summary judgment regarding the 1998 agreement, arguing that the purpose of the agreement was to defraud

1   creditors, and, therefore, is void for illegality and lack of
2   mutuality.   In support, they rely exclusively on Plaintiff's
3   February 9, 2009 deposition testimony.   In this deposition,
4   Plaintiff explained that the 1998 Agreement was formed so that
5   Simmons would have something to show creditors and "keep
6   [Plaintiff] away from Clean Air Products and protect his cash
7   flow." (Smith Decl. 25:11-25:14.)   Plaintiff testified that the
8   Agreement was "made up so that [Simmons] would have this to show to
9   creditors or to court for the idea of keeping him out of trouble
10  with creditors. (Id at 28:5-28:15.)   Plaintiff stated that Simmons
11  wanted a document to demonstrate that Clean Air was not liable for
12  Help Smog Parts' liabilities and if Simmons was sued "he'd have
13  something to show the judge, this is the corporation, it's not me."
14  (Id at 61:1-61:8.)   However, Plaintiff testified that the document
15  accurately reflected the terms of the agreement.   (Id. at 28:5-
16  28:19; Smith Decl. ¶ 3.)

17      Defendants interpret Plaintiff's testimony as an express
18  admission that the November 1998 Agreement was made to defraud
19  creditors, was never intended to be binding, and did not reflect
20  the true intentions of the parties. (DSUF 2-5.)   Defendants argue
21  that these admissions invalidate the 1998 Agreement and support an
22  entry of summary judgment. (DSUF 7,8,11.)

23      Plaintiff disputes Defendants' characterization of his
24  testimony. While Plaintiff admits stating that the 1998 Agreement
25  did not completely accurately state the parties' intentions, he
26  denies stating that the transaction was illegal or meant to defraud
27  creditors.   Plaintiff contends that the document accurately sets
28  forth the basis on which the parties performed and that Defendants

**11**

1  fail to cite an express law or policy violated by the agreement.

2  The California Civil Code provides that agreements must have
3  a lawful objective when made.  *See* Cal Civ Code §§ 1550, 1596.
4  Generally, courts will not enforce an agreement whose sole object
5  is unlawful. Cal Civ Code §§ 1598; *Tiedje v Aluminum Taper Milling*
6  *Co., Inc.*, 46 Cal. 2d 450, 453-54 (1956) ("A contract made contrary
7  to public policy or against the express mandate of a statute may
8  not serve as the foundation of any action, either in law or in
9  equity."); *see* Cal Civ Code § 1667 (defining unlawfulness).  An
10 agreement may be held unenforceable "whether the evidence of the
11 illegality is produced by plaintiff or by defendant." *Wells v*
12 *Comstock*, 46 Cal. 2d 528, 532 (1956).  This rule is based on
13 general equitable principles.  *See Tri-Q, Inc. v Sta-Hi Corp.*, 63
14 Cal. 2d 199, 218,(1965) (stating courts apply equity principles "to
15 prevent the guilty party from reaping the benefit of his wrongful
16 conduct" and "to protect the public from the future consequences of
17 an illegal contract.")

18 The general rule that the court will not enforce an illegal
19 agreement is subject to a number of presumptions and exceptions.
20 "If a contract can be performed legally, a court will presume that
21 the parties intended a lawful mode of performance." *Redke v*
22 *Abraham Silvertrust*, 6 Cal. 3d 94, 102 (1971).  This presumption
23 may be overcome by demonstrating that the party seeking to enforce
24 the contract intended an illegal mode of performance.  *Id*. at
25 103-04; *Tri-O*, 63 Cal. 2d at 219; *Tiedje*, 46 Cal. 2d at 454
26 (holding that an agreement may be enforced if the party seeking to
27 enforce the agreement was "justifiably ignorant" of the facts that
28 make the agreement illegal).

**12**

1    Cases which have applied these principles fall into several
2  broad categories. A common situation involves the unlicensed
3  professional, who seeks to collect money for services rendered.
4  Courts have routinely refused to grant relief in such cases on the
5  ground that the failure to comply with licensing requirements
6  violates a law designed to protect and benefit the public.
7  Therefore a party who has violated the law and entered into an
8  agreement to perform services while unlicensed cannot obtain the
9  aid of courts to enforce the agreement. *Loving & Evans v. Blick* 33
10 Cal.2d 603, 607 (1949); *Franklin v. Nat C. Goldstone Agency* 33
11 Cal.2d 628 (1949).

12   In another factual context, courts have refused to grant
13 relief to parties seeking to collect monies arising from illegal
14 gambling activities. (*Lee On v. Long* (1951) 37 Cal.2d 499; *Fong v.*
15 *Miller* (1951) 105 Cal.App.2d 411.)  A third group of cases involves
16 plaintiffs who have attempted to circumvent state or federal law.[11]

17   There is a meaningful difference between the unlawful
18 agreements described above and the subject agreement.  Here,
19 Plaintiff and Defendant Clean Air entered into a written agreement
20 which specifically provided that Plaintiff would sell certain
21 assets of Help Smog Parts to Defendant Clean Air for $430,000.  As
22 described in Part II(B), *supra*, the agreement outlined the payment
23 terms and the specific assets purchased by Clean Air.  It also
24 superceded all prior contracts between the parties, in essence

25

26     [11]  Generally these cases arise to obtain government
27 benefits and entitlements available only to certain individuals,
   or to evade paying government taxes. See e.g., *Lala v. Maiorana,*
28 166 Cal.App.2d 724 (1959).

**13**

becoming the operative record of the asset sale.  The purpose of the agreement is unambiguous: to sell the assets of Help Smog Parts to Clean Air and memorialize the rights and liabilities of the respective parties.

Based solely on Plaintiff's deposition testimony, Defendants argue that the purpose of the contract was to defraud creditors. Defendants' claim of fraudulent intent is contrary to the undisputed facts.  The terms of the contract illustrate that 1998 Agreement was a structured asset sale to a corporate entity.[12]  It was constructed to limit liability - first, as an asset sale; second, as a purchase by a corporate entity without a supporting personal guaranty.  Such agreements are common in today's business landscape and are not probative of illegality or lack of mutuality.[13]

Contrary to Defendants' litigation position, Defendants performed as if they were bound by the terms of the agreement from November 1998 through much of 2003.  Such actions evidence mutual consent and mutual intent to be bound by the terms of the 1998 Agreement. *See Bustamante v. Intuit, Inc*., 141 Cal. App. 4th 199, 208 (2006) (stating "[c]ontract formation requires mutual consent"); *see also Alexander v. Codemasters Group Ltd.*, 104 Cal. App. 4th 129, 141 (2002) (stating "[m]utual consent is determined under an objective standard applied to outward manifestations or expressions of the parties, i.e., the reasonable meaning of their

_____

[12] See Part V(B)-V(C), *supra*.

[13] See *In re Chrysler*, U.S. Bankruptcy Court, S.D.N.Y. (Case No. 09-5002), approving the sale of Chrysler, LLC's assets to Italian Automaker Fiat.

**14**

words and acts ...."").   Where the "existence of a contract is at issue and the evidence is conflicting or admits of more than one inference, it is for the trier of fact to determine whether the contract actually existed." *Bustamante*, 141 Cal. App. 4th at 208.

Viewing the facts in the light most favorable to Plaintiff, the non-moving party, Defendants have not demonstrated as a matter of law that the purpose of agreement was unlawful or that Plaintiff intended to act unlawfully in performing the agreement.   An asset sale between two corporations, with the purpose of limiting individual liability, is not violative of the law or public policy. There is no evidence the contract was intended to defraud creditors or equates to a lack of mutuality.   Defendants provide no evidence that Plaintiff drafted the agreement with an improper purpose.   The only evidence, Plaintiff's deposition testimony, provides little support; while Plaintiff admits that the agreement was made to protect Simmons from Help Smog Parts' creditors, it does not prevent performance of the agreement's intended purpose.

Defendants' motion concerning the validity of the 1998 Agreement is DENIED.

B.   **The 2001 Agreement**

Plaintiff argues that Defendants breached the 2001 Referral Agreement and that damages resulted from this breach.   However, Plaintiff does not provide a discernable basis for this claim. Plaintiff has not identified nor provided evidence that Defendants breached a duty owed Plaintiff under the 2001 Agreement. The most comprehensible statement Plaintiff makes in his opposition and declaration provides:

**15**

5.   The idea of the 2001 document was for me to prepare the suggested business plans for Simmons to try to steer prospective buyers to him.  The prospective buyers could be either buyers to purchase existing inventory or potentially the entire business of Help Smog Parts.  I would not necessarily refer to customers and prospective buyers any differently.  The idea was to help Simmons sell through Help Smog Parts whether to individual customers or bulk buyers and improve his bottom line at Help Smog Parts.  I was supposed to draft up business plans for Simmons and help him move forward.

6.   I drafted up some plans and provided them to Simmons.  Unfortunately, I did not keep copies of any of the plans I prepared.  It does not appear to me that any of the plans I came up with were ever implemented.

7.   I also referred customers to Simmons after 2001.  Unfortunately, I do not recall the names of the customers that I referred to him.  I do recall getting feedback from some of the people I referred to Simmons, however, that they did not get the help or assistance I told them would be forthcoming.  As far as I know, no deals were consummated by Simmons with any of the people I referred to him.

(T. Smith Decl. ¶ 5-7.)

Plaintiff barely mentions the 2001 Agreement in his opposition, ignoring the central dispute:

Defendants contend that the 2001 Agreement relates only to a sale of the entire business.  This is not Smith's interpretation.  The language in the agreement is susceptible of either interpretation.  That being the case, the Court cannot grant summary adjudication on this issue.

(Pl.'s Opp'n at 9.)

Plaintiff's cursory statement does not provide a basis for recovery under the 2001 Agreement.  To the extent that Plaintiff argues that Defendants breached the 2001 Agreement without making

**16**

any sales, Plaintiff cites no support for his unique legal theory. Plaintiff's attempt to expand the outer boundaries of contract law is unavailing.

Defendants also argue that the 2001 Agreement was subject to a condition precedent, that Plaintiff was required to refer a prospective buyer to purchase Help Smog Parts for more than $500,000.  There was no buyer and no proceeds to divide.  The Agreement states:

> Smith will solicit prospective buyers that will be referred to Simmons to close any deals.  If, and when, a buyer is secured the sales and proceeds will be divided as follows:
>
> * After the figure of $500,000 is exceeded, any overage will be split 50/50 between Smith and Clean Air Products, Inc.  [...]
>
> * Any closing costs related to the sale will be split between Smith and Clean Air Products, Inc.

(Doc. 98, 4thAC, Exh.2, pg.1.)

Under the contract principles discussed in Part V(D), *infra*, the only reasonable interpretation is that Plaintiff agreed to obtain a buyer for the entire Help Smog Parts business and that the parties would split any sale proceeds over $500,000.  The Agreement references "Buyers" throughout the agreement, not "customers" or "purchasers of existing inventory."  The Agreement also allocates closing costs between the parties.  It is undisputed that there are no closing costs for purchases or sales of smog parts.

Plaintiff has not demonstrated that the language is susceptible of two interpretations.  In arguing that Clean Air is

**17**

undercapitalized, Plaintiff claims that Help Smog Parts' business has declined substantially and is worth considerably less than when he sold it.  The assets of Help Smog Parts were sold for $430,000 in 1998 - and the business is worth considerable less now.  The contract is susceptible to only one interpretation: that Plaintiff was to be paid if he found a buyer for the entire business.

Taking the facts in a light most favorable to Plaintiff, no reasonable trier of fact could conclude that the 2001 Agreement contemplated inventory sales of $500,000.  Defendants' motion for summary judgment regarding Plaintiff's claim for breach of the 2001 Agreement is GRANTED.

C.   **Alter Ego**

Ordinarily, a corporation is regarded as a legal entity separate and distinct from its stockholders, officers and directors.[14]   Under the alter ego doctrine, however, where a corporation is used by an individual or individuals, or by another

---

[14] "A request to pierce the corporate veil is only a means of imposing liability for an underlying cause of action and is not a cause of action in and of itself." *Local 159 v. Nor-Cal Plumbing, Inc.*, 185 F.3d 978, 985 (9th Cir.1999); *see also In re Grothues*, 226 F.3d 334, 337-38 (5th Cir. 2000) (alter ego theory is a remedy to enforce a substantive right, not an independent cause of action).  Put another way, a claim against a defendant based on the alter ego theory is a derivative of the substantive cause of action against the corporate defendant. It is "not itself a claim for substantive relief," but rather is a means to "disregard the corporate entity as a distinct defendant and to hold the alter ego individuals liable on the obligations of the corporation where the corporate form is being used by the individuals to escape personal liability, sanction a fraud, or promote injustice." *Hennessey's Tavern, Inc. v. American Air Filter Co., Inc.*, 204 Cal. App. 3d 1351, 1359, 251 Cal. Rptr. 859 (1988).

18

corporation, to perpetrate fraud, circumvent a statute, or accomplish some other wrongful or inequitable purpose, a court may disregard the corporate entity and treat the corporation's acts as if they were done by the persons actually controlling the corporation." *Robbins v. Blecher*, 52 Cal.App.4th 886, 892 (1997). "Shareholders of a corporation are not normally liable for its torts, but personal liability may attach to them through application of the 'alter ego' doctrine ..., or when the shareholder specifically directed or authorized the wrongful acts." *Wyatt v. Union Mortgage Co.*, 24 Cal.3d 773, 785 (1979).

Although there is no specific "litmus test" for identifying when an individual is the alter ego of an entity, there are, nevertheless, two general requirements: (1) that there is such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist and (2) that failure to disregard their separate identities would result in fraud or injustice. *Mesler v. Bragg Mngmt Co.*, 39 Cal. 3d 290 (1985); *Sonora Diamond*, 83 Cal.App.4th at 538. It is the plaintiff's burden to establish both elements and thereby overcome the presumption of a corporate existence. *Mid-Century Ins. Co. v. Gardner*, 9 Cal. App. 4th 1205, 1212 (1992) No one characteristic governs a finding of alter ego, and the court must look to all of the circumstances to determine whether the doctrine should be applied. *Talbot v. Fresno-Pacific Corp.*, 181 Cal.App.2d 425, 432 (1960). Alter ego is an extreme remedy, sparingly used. *Sonora Diamond*, 83 Cal.App.4th at 538-39.

1.   <u>Unity of Interest</u>

California courts emphasize that the alter ego determination is very fact specific.  Some of the factors that California courts consider when assessing whether there is the requisite "unity of interest" include: inadequate capitalization, commingling of funds and other assets, holding out by one entity that it is liable for the debts of the other, identical equitable ownership, use of the same offices and employees, use of one as a mere conduit for the affairs of the other, disregard of corporate formalities, lack of segregation of corporate records, and identical directors and officers. *VirtualMagic Asia, Inc., v. Fil-Cartoons, Inc.*, 99 Cal. App.4th 228, 245 (2002).

Defendants focus on the following characteristics of Clean Air to demonstrate the distinction between Simmons and Clean Air:

> 1. The finances for Clean Air are kept separated and distinct from the finances of Darrin Simmons;
>
> 2. Clean Air and Simmons maintain separate bank accounts;
>
> 3. Neither Simmons nor Clean Air holds itself out as being liable for the other's assets or debts;
>
> 4. Clean Air employees are paid by Clean Air and do not perform personal errands for Simmons;
>
> 5. Clean Air maintain has a business office separate from Simmons' residence;
>
> 6. Clean Air is adequately capitalized; and
>
> 7. Corporate formalities are observed and current, with Clean Air holding officer elections each year since 1998.

(DSUF 18-24; Doc. 114, Exh. A, DS 017-039.)

**20**

In contrast, Plaintiff raises the following to impose unity of interest between Simmons and Clean Air:

1. Simmons is the sole owner of Clean Air stock; and
2. Clean Air has only Simmons and one part time employee operating the business.

(Smith Decl. ¶ 4.)

Here, the extreme remedy of declaring Simmons the alter ego of Clean Air is unjustified by the evidence. Plaintiff presents no evidence, other than stock ownership, to demonstrate that Simmons disregarded the corporate form. Rather, the undisputed evidence indicates that Clean Air maintained a separate financial existence from Simmons, maintaining separate bank accounts, paying its employees out of corporate funds, keeping a corporate office, and not commingling debts. The record also indicates that various individuals took officer roles within Clean Air and board meetings appear to have been conducted with the formality expected from a corporation.

Balancing all applicable factors, Plaintiff's unsupported assertions of Defendants' unified interest are not enough to create a genuine issue of material fact. The separateness between Clean Air's corporate form, Simmons, and their functions, Defendants have met their Rule 56 burden and demonstrated, as a matter of law, that there is not "unity of interest" for alter ego purposes.

2. <u>Injustice</u>

Plaintiff asserts that refusing to pierce the corporate veil is inequitable because it would defeat the intent of the parties.

**21**

Plaintiff then maintains that Clean Air's worth has significantly decreased since 1998, which Plaintiff argues is a sign of inadequate capitalization. In essence, Plaintiff claims that Clean Air does not have sufficient assets to pay what it owes if it were to lose at trial.

California courts have rejected the view that the potential difficulty a plaintiff faces collecting a judgment is an inequitable circumstances that warrants application of the alter ego doctrine. *Virtualmagic Asia, Inc.*, 99 Cal. App. 4th 228, 245 (2002) ("Alter ego will not be applied absent evidence that an injustice would result from the recognition of separate corporate identities, and 'difficulty in enforcing a judgment or collecting a debt does not satisfy this standard,'" quoting *Sonora Diamond Corp.*, *supra*, 83 Cal. App. 4th at 539); *Mid-Century Ins. Co. v. Gardner*, 9 Cal. App. 4th 1205, 1213 (1992) ("'Certainly, it is not sufficient to merely show that a creditor will remain unsatisfied if the corporate veil is not pierced, and thus set up such an unhappy circumstance as proof of an 'inequitable result. In almost every instance where a plaintiff has attempted to invoke the doctrine he is an unsatisfied creditor,'" *quoting Associated Vendors, Inc. v. Oakland Meat Co.*, 210 Cal. App. 2d 825, 842 (1962)).

Rather, California courts generally require some evidence of bad faith conduct on the part of defendants before concluding that an inequitable result justifies an alter ego finding. *Mid-Century Ins. Co.*, 9 Cal. App. 4th at 1213 ("'The purpose of the doctrine is not to protect every unsatisfied creditor, but rather to afford him protection, where some conduct amounting to bad faith makes it

**22**

inequitable, under the applicable rule above cited, for the equitable owner of a corporation to hide behind its corporate veil,'" quoting Associated Vendors, *supra*, 210 Cal. App. 2d at 842).

Plaintiff does not produce any evidence that Clean Air engaged in any bad faith conduct when contracting with Plaintiff in 1998, 2001, or any other time.  He barely mentions that treating Simmons separate from Clean Air would perpetrate fraud or injustice, noting that it "is an issue to consider."  Plaintiff also has not provided evidence of a fraudulent or deliberate motive behind his claims that Clean Air is inadequately capitalized.  Rather, Plaintiff only infers that Clean Air does not presently have sufficient funds to pay a money judgment in this case.  This is contrary to established California law.  *Virtualmagic Asia, Inc*., 99 Cal. App. 4th 228, 245.

Both unity of interest and injustice must be found to exist before the corporate existence will be disregarded.  Under the totality of the circumstances, here, Plaintiff has not created a genuine issue of material fact as to either element.

Simmons and Clean Air are entitled to summary adjudication as to Plaintiff's alter ego claim.  Defendants' motion is GRANTED.

D.   <u>Personal Liability of Darrin K. Simmons</u>

The parties focus on Defendant Simmons' signature found on the second page of the "Agreement and Contract of Sale."  In the signature block, immediately below Plaintiff's signature, Simmons signed the contract "Darrin K. Simmons, V.P."  Next to the signature is the text "Darrin Simmons."

Under California law, the parties' mutual intent must be objectively reasonably be determined to ascertain whether there is a personal guaranty.

> In this state ... the intention of the parties as expressed in the contract is the source of contractual rights and duties. A court must ascertain and give effect to this intention by determining what the parties meant by the words they used.

*Pacific Gas and Electric, Co., v. G. W. Thomas Drayage & Rigging Co., Inc.*, 69 Cal.2d 33, 38 (1968). "The precise meaning of any contract, . . ., depends upon the parties' expressed intent, using an objective standard." *ASP Properties Group, v. Fard, Inc.*, 133 Cal.App. 4th 1257, 1266 (2005).

Where the parties disagree about the meaning of the contract, the Court construes the contract using a two step process. First, the Court must determine whether the contract is "ambiguous." Whether the contract is "ambiguous" is a question of law. *Id*. If the language of the contract cannot reasonably be construed as a party suggests then the Court will find that the contract is not "ambiguous" and the inquiry is over. If, on the other hand, the Court finds that the contract is "reasonably susceptible to either of the meanings urged by the parties" then the Court "moves on to the second step which is to determine just what the parties intended the contract term to mean." *Curry*, 40 Cal. App. 4th at 1552.

In the second step, the Court admits extrinsic evidence, if any, proffered by each party to aid in interpreting the contract. ASP Properties, 133 Cal.App. 4th at 1266. If the parties submit no extrinsic evidence, or if the material extrinsic evidence is not in

**24**

conflict, the Court's construction of the contract is purely a question of law. Id. If, however, the evidence presents a genuine issue of material fact, that fact issue must be resolved by a jury before the Court can interpret the contract.

### 1. Ambiguity

A contract provision is ambiguous when it is capable of two or more constructions both of which are reasonable. Bay Cities Paving & Grading, Inc. v. Lawyers Mutual Ins. Co., 5 Cal. 4th 854, 867 (1993) Courts will not adopt a strained or absurd interpretation in order to create an ambiguity where none exists. Id. Language in a contract must be construed in the context of that instrument as a whole, and in the circumstances of the case, and cannot be found to be ambiguous in the abstract. Id.; see also Bank of the West v. Superior Court, 2 Cal.4th 1254, 1265 (1992).

Under California law, "[t]he whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." Navarro v. Mukasey, 518 F.3d 729, 734 (9th Cir.2008), citing California Civil Code § 1641. "A contract must be so interpreted to give effect to the mutual intentions of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." Id., citing California Civil Code § 1636. "It is well settled that '[w]here there is an inconsistency between general provisions and specific provisions, the specific provisions ordinarily qualify the meaning of the general provisions.'" Brinderson-Newberg Joint Venture v. Pacific Erectors, Inc., 971 F.2d 272, 279 (9th Cir.1992), cert. denied, 507 U.S. 914,(1993).

1    Plaintiff argues that the parties intended that Simmons was
2  personally guaranteeing Clean Air's debt to Plaintiff. Defendants,
3  on the other hand, contend that the 1998 Agreement can be
4  understood only as a contract between Clean Air and Plaintiff for
5  the purchase of Help Smog Parts, Inc. According to Simmons, he did
6  not personally guarantee Clean Air's debt by signing the 1998
7  Agreement, and did so solely as an agent of Clean Air.

8    It is clear that the primary (if not entire) thrust of the
9  1998 Agreement is to sell the assets of "Help Smog Parts, Inc." to
10  Clean Air Products, Inc.   The Agreement contains multiple
11  references to the fact that the agreement is "between" the entity
12  Clean Air Products, Inc., and Land O'Goshen, Inc.   While Land
13  O'Goshen, Clean Air Products, Inc., and Thomas N. Smith are
14  mentioned numerous times throughout the body of the Agreement, the
15  name "Darrin K. Simmons" is not mentioned once.

16    The circumstances surrounding the Agreement are also relevant
17  to the inquiry. It is undisputed that the subject of the Agreement
18  was an asset sale and that Plaintiff drafted the Agreement. Under
19  California law, ambiguity in contracts will generally be construed
20  against the party who drafted the contract. *Cathay Bank v. Lee*, 14
21  Cal. App. 4th 1533, 1538 (4th Dist. 1993).   It is also undisputed
22  that there is no indication in the agreement or otherwise that a
23  personal guaranty would be created.

24    There is only one reasonable interpretation based on the
25  contract's words and the context, both textual and practical, in
26  which the words are used:   The agreement is unambiguous on its
27  face. The contract is for the sale of assets by one corporation to
28  another. There is no mention of Simmons although there is of Smith

**26**

as an individual.  There is no reference or language of guaranty used in the writing.


A.  Descriptio Personae

Plaintiff argues that the doctrine of Descriptio Peronsae supports his position that Simmons personally guaranteed the 1998 Agreement.  In *Sebastian Int'l, Inc. v. Peck*, 195 Cal. App. 3d 803, the defendant was the vice president of a company that subleased office space from Sebastian. After the company defaulted on the lease, Sebastian turned to Peck personally for compensation, pursuant to a guarantee. The guarantee document referred only to Peck.  It did not refer to the company or Peck's relationship with the company.   The signature line of the guarantee, however, included the designation "Vice President" following Peck's name. Peck argued that although the document referred only to him personally, the signature line controlled.  He claimed that he had signed the guarantee on behalf of the corporation, and argued that the company was liable under the guarantee, not him personally. The appellate court did not agree.    It stated that in some circumstances, a corporate title following a name is merely descriptio personae - a term describing the person, rather than the capacity in which the person signed the document.  The appellate court held that the signature line did not control when the words of the document referred to Peck alone, and raised no ambiguity as to the identity of the guarantor.

*Sebastion* is distinguishable on its facts.  Apart from the signature line, the Agreement contains no reference to Simmons, to his relationship to Clean Air, or to a personal guarantee.  On the

**27**

contrary, the agreement refers only to "Clean Air Products, Inc." as "Buyer" and specifies that Clean Air "desires to purchase the residue inventory from [...] Help Smog Parts."   As the 1998 Agreement does not reference Simmons or a personal guarantee of Clean Air's debts - facts indispensable to the Calfiornia Supreme Court's analysis - *Sebastion* presents a vastly different situation.

In this case, there is no evidence that Plaintiff personally guaranteed Clean Air's debts.   The terms of the 1998 Agreement do not create personal liability on the part of Defendant Simmons. The 1998 Agreement clearly makes a distinction between the "Clean Air Products, Inc." and  "Darrin Simmons," who did not personally guarantee the asset purchase.   This conclusion is further substantiated by Clean Air's and Plaintiff's failure to identify Simmons in the agreement, or to include any language of personal guaranty or suretyship.

There are no material issues of fact concerning Simmons' personal liability.   There is no personal guarantee.   Summary adjudication is GRANTED.

## 2.  **Motion For Sanctions**

Defendants move for Rule 11 sanctions in the amount of approximately $ 32,964.00, which is what Simmons and Clean Air assert is approximately the amount of fees and costs incurred by them in this litigation matter to date.   Defendants argues that Rule 11 sanctions are warranted because plaintiff and his counsel filed and reaffirmed a frivolous complaint, filed for an improper purpose.

A hearing on Defendants' motions for summary judgment and for

**28**

Rule 11 sanctions was held on June 1, 2009.  During the hearing Defendants withdrew their motion for sanctions.  As such, Defendants' motion for Rule 11 sanctions is denied as moot.

**VI. <u>CONCLUSION</u>.**

For the foregoing reasons:

1.    Defendants' motion for summary adjudication is DENIED as to the illegality of the 1998 Agreement.

2.    Defendants' motion for summary adjudication is GRANTED as the 2001 Agreement included a condition precedent that was never satisfied;

3.    Defendants' motion for summary adjudication is GRANTED as to Plaintiff's alter ego claim;

4.    Defendants' motion for summary adjudication GRANTED as to Simmons' personal liability; and

5.    Defendants' motion for Rule 11 sanctions is DENIED as moot.


IT IS SO ORDERED.

**Dated:    June 19, 2009**                      /s/ Oliver W. Wanger
                                    UNITED STATES DISTRICT JUDGE